SEMPER LAW GROUP, LLP
LEONARD M. TAVERA, State Bar No. 127070
330 N. Brand Boulevard, Suite 235
Glendale, California 91203
Telephone: (213) 437-9700
Facsimile: (213) 596-1466
Email: ltavera@semperlawgroup.com

Attorneys for Plaintiff
EMPORIO GROUP ENTERTAINMENT, INC.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMPORIO GROUP ENTERTAINMENT, INC.<br><br>Plaintiff,<br>v.<br><br>PHANTOM VOX ENTERTAINMENT, LLC, PARADIGM TALENT AGENCY, LLC, DRACO CORNELIUS ROSA, and DOES 1-200, inclusive.<br><br>Defendants. | *CIV. No.* 19-<br><br>COMPLAINT FOR DAMAGES; BREACH OF CONTRACT; TORTIOUS INTERFERENCE WITH CONCTRACTUAL OBLIGATION; UNJUST ENRICHMENT |

**COMES NOW** Plaintiff, Emporio Group Entertainment, Inc., complaining and alleging as follows:

## PARTIES TO THE ACTION, JURISDICTION AND VENUE

1. Plaintiff Emporio Group Entertainment, Inc. (Emporio), is a corporation organized under the laws of the State of Florida that is in the business of producing concerts and live events. Its principal place of business is located in Coral Gables, Florida.

2. Defendant Phantom Vox Entertainment, LLC (Phantom) is a California limited liability company with its principal place of business in Encino, California.

3. Defendant Paradigm Talent Agency, LLC (Paradigm) is a Delaware limited liability company authorized to do business in California.

4. Defendant Draco Cornelius Rosa (Draco), is of legal age, a musical artist and entrepreneur, and a resident of Beverly Hills, California.

5. Plaintiff is ignorant of the true names of DOES 1-200 inclusive and therefore sues these Defendants by those fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when they have been ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is contractually or otherwise legally responsible in some manner for the occurrences alleged in the Complaint and for Plaintiff's damages.

6. At all times herein mentioned, each of the Defendants, except as otherwise alleged, was the agent, servant, employee and/or joint-venturer of his, her or its co-Defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture. Defendants, and each of them, agreed and conspired among themselves, and with certain other individuals and/or entities, to act, or not to act, in such a manner that resulted in injury to the Plaintiff and such Defendants, as co-conspirators, are liable for the acts, or failures to act, of the other conspiring Defendants.

7. Wherever appearing in this Complaint, each and every reference to Defendants and to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, otherwise specifically qualified.

8. Plaintiff does not presently know the true names and capacities of the defendants sued herein as Does 1 through 200, inclusive. Plaintiff will seek leave of court to amend this Complaint to allege said defendants' names and capacities as soon as Plaintiff ascertains them.

9. This Court has jurisdiction over the present action pursuant to 28 U.S.C.

-2-
COMPLAINT FOR DAMAGES

§1332 because total diversity of citizenship exists between plaintiff and defendants as they are citizens of different states, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

10. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because co-defendants Phantom and Paradigm do business in this district, and co-defendant Draco is domiciled in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

11. Plaintiff incorporates each allegation set forth in all of the preceding paragraphs as though set forth fully herein.

12. On July 26, 2018, Defendant, Phantom Vox Entertainment (Phantom) contracted with Emporio Group Entertainment, Inc. (Emporio) to produce a concert featuring Draco Cornelius Rosa (Draco) in Miami on November 17, 2018. A copy of the contract is attached hereto as Exhibit A. Said copy is redacted to protect certain banking information.

13. Per the contract at Paragraph 3, deposits totaling $30,000 were to be wired by Plaintiff Emporio to Paradigm Talent Agency, LLC (Paradigm). Plaintiff Emporio made the $30,000 in deposits as required by the Contract.

14. After the contract was signed, Plaintiff Emporio mounted a promotional campaign for the concert through social media and radio. With Defendants' consent, Plaintiff Emporio contracted with the reggae band "*Cultura Profetica*" to appear before Draco's performance.

15. As a result of Plaintiff Emporio's media campaign, ticket sales for the Miami concert were excellent. Plaintiff Emporio started to receive accolades for the production of the concert on the scheduled dates and the chosen performance arenas.

16. On October 25, 2018, weeks after the sale of tickets and promotion for the concerts began, Draco, with full knowledge of the contract between Plaintiff Emperio and Defendant Phantom, intentionally, unilaterally and publicly announced on his social media page (with over 345,000 followers), that he would not be performing at the concert

on the agreed upon date. In so doing, Defendant Draco intentionally and tortuously interfered with the agreement between Emporio and Phantom. Defendant Draco did so without cause and in order to benefit and unjustly enrich himself.

17. In October 2018, approximately three weeks before the performance was to occur, Draco, knowing that Defendant Phantom had a contractual obligation to produce him for the concert, tortiously interfered with Emporio's contract with Phantom by instructing Phantom to cancel the contract with Emporio.

18. At Draco's request, Phantom canceled the concert without cause, thereby breaching its contract with Emporio.

19. Draco's announcement and Defendant Phantom's resulting concert cancellation was verified through Draco's representatives. Plaintiff Emporio has incurred severe damages and injury as purchased tickets have been, and continue to be, returned to the public, the loss of new ticket sales, loss of performance advances, advances loss of profits/revenue, including and not limited to venue costs, spent advertising, promotional monies, overall production costs, plus severe damage to Emporio's commercial goodwill among Emporio's sponsors and the general public due to the unjustified cancellation of the concert.

20. Plaintiff Emporio has complied with all the requisites of the contract and had provided Defendants, and each of them, notification of the breach and providing defendants with an opportunity to cure said breach.

21. All of Emporio's damages and injuries are a direct result of Draco's intentional and/or negligent tortious interference of the contracts between Defendant Phantom and Plaintiff Emporio and from Defendant Phantom's unjustified cancellation of the contract.

## V. CAUSES OF ACTION

**A.** **Breach of Contract**

22. Plaintiff incorporates each allegation set forth in all of the preceding paragraphs as though set forth fully herein.

23. Defendant Phantom breached its contract with Emporio by cancelling without cause at Draco's behest.

24. As direct and proximate result of Phantom's intentional breach of the contract, Plaintiff Emporio has suffered damages in the form of loss of profits/revenues, marketing and promotion monies, loss of credibility in the industry, and costs and interest, which are estimated in excess of $800,000.00.

25. The contract provides that if one party has to sue as a result of another party's breach and the suing party prevails, the suing party is entitled to the payment of attorneys' fees and costs.

### B. Tortious Interference of Contract

26. Plaintiff incorporates each allegation set forth in all of the preceding paragraphs as though set forth fully herein.

27. Defendant Draco's intentional act of inducing Phantom to cancel, without cause, his contract to perform at the *Mana Wynwood RC Cola Plant* venue in Miami, Florida on November 17, 2018 as agreed to by Phantom constitutes tortious interference of the contract between Phantom and Emporio.

28. As direct and proximate result of Draco's intentional tortious interference with the contract between Emporio and Phantom and his intentional and unilateral cancellation, Emporio has suffered damages in the form of loss of profits/revenues, marketing and promotion monies, loss of credibility in the industry, and costs and interest, which are estimated in excess of $800,000.00.

### C. Unjust Enrichment

29. Plaintiff incorporates each allegation set forth in all of the preceding paragraphs as though set forth fully herein.

30. Paradigm was unjustly enriched at plaintiff Emporio's expense and as such should be required to make restitution for the monies and/or benefits Paradigm received.

31. Furthermore, through and with knowledge of its actions, Paradigm's patrimony increased substantially while Plaintiff's patrimony decreased.

32. Emporio has no remedy at law for Paradigm's unjust enrichment.

33. Hence Plaintiff, Emporio requests a sum of no less than $30,000.00 for unjust enrichment from Paradigm.

## VI. JURY DEMAND

34. Plaintiff, Emporio Group Entertainment, Inc., requests a jury trial.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment against defendants as follows:

1. General damages of no less than $800,000 against defendant Phantom Vox Entertainment, LLC on the First Cause of Action for Breach of Contract;

2. General damages of no less than $800,000 against Draco Cornelius Rosa on the Second Cause of Action for Tortious Interference with Contract;

3. General damages of no less than $30,000 against Paradigm Talent Agency, LLC; for $30,000 on the Third Cause of Action for Unjust Enrichment;

4. Prejudgment and post-judgment interest against all defendants according to proof;

5. Costs of suit herein;

6. Reasonable attorneys' fees: and

7. Such other and further relief as the Court deems proper and just.

DATED: December 30, 2019  SEMPER LAW GROUP, LLP

By: _____
LEONARD M. TAVERA
Attorneys for EMPORIO GROUP
ENTERTAINMENT, INC

-6-
COMPLAINT FOR DAMAGES

# EXHIBIT A

PARADIGM TALENT AGENCY

PERFORMANCE CONTRACT | # 188465 | PAGE 1 OF 3

1658 NORTH MILWAUKEE AVENUE #211 | CHICAGO, IL 60647 | (773) 489-3500 | (773) 489-3535 FAX | NY LIC# 1010614-DCA / CA LIC# TA000206953

**Draco Rosa  MANA Wynwood RC Cola Plant  Miami, FL  Sat, Nov 17, 2018**

Agent: Victor Mercado | vmercado@paradigmagency.com

THIS PERFORMANCE CONTRACT is dated Thursday, July 26, 2018 by and between PHANTOM VOX ENTERTAINMENT, LLC ("ARTIST COMPANY"), which shall furnish the services of Draco Rosa ("ARTIST"), and EMPORIO GROUP ENTERTAINMENT ("PURCHASER") for the engagement listed below on the terms and conditions set forth in this Agreement.

This Performance Contract between ARTIST COMPANY and PURCHASER consists of this principal agreement together with the Additional Terms and Conditions, ARTIST'S RIDER (if any) and any other exhibits and addenda which are attached hereto and incorporated herein by this reference (collectively, this "Agreement").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, PURCHASER and ARTIST COMPANY hereby agree as follows:

1. **ENGAGEMENT / VENUE:**

   VENUE: MANA Wynwood RC Cola Plant
   ADDRESS: 599 NW 23rd St.
   Miami, FL 33127
   United States
   SUPPORT: TBA
   DATE OF SHOW(S): Sat, Nov 17, 2018     T.B.D.     SET LENGTH: 1 x 75 minutes
   NO. OF SHOWS: 1     AGES: 16+
   ARTIST TIME: Set Time TBD: 1 x 75 min - Set time to be approved by Agent

2. **COMPENSATION:**

   $ 30,000.00 guaranteed to ARTIST (the "Guarantee").

   Flat Guarantee.

   Purchaser to provide and pay for Hotel accommodation, per Artist advance.

   Purchaser to provide and pay for local ground transportation, per Artist advance.

3. **PAYMENT TERMS:**

   PURCHASER shall pay a deposit in the amount of $ 15,000.00 to PARADIGM TALENT AGENCY, LLC no later than Friday, August 17, 2018.

   PURCHASER shall pay a deposit in the amount of $ 15,000.00 to PARADIGM TALENT AGENCY, LLC no later than Wednesday, October 17, 2018.

   All deposits shall be payable by bank wire to:

   PARADIGM TALENT AGENCY, LLC

   The balance of the Guarantee shall be paid to and in the name of ARTIST COMPANY by cash or cashier's check not later than the evening of the Engagement. If the percentage of gross ticket receipts exceed the Guarantee, the overage amount due shall be paid in full to ARTIST COMPANY in cash or by cashier's check or bank wire (as designated by ARTIST COMPANY) immediately following the Engagement.

4. **PRODUCTION:**

   PURCHASER to provide and pay for Sound and Lights, approved by ARTIST.

5. **BILLING:**

   100% Co-Headline

   Draco Rosa to perform second to close, directly prior to Cultura Profetica.

Performance Contract 188465.pdf

page 1 of 3

**PARADIGM TALENT AGENCY**

**PERFORMANCE CONTRACT | # 188465 | PAGE 2 OF 3**

1658 NORTH MILWAUKEE AVENUE #211 | CHICAGO, IL 60647 | (773) 489-3500 | (773) 489-3535 FAX | NY LIC# 1010614-DCA / CA LIC# TA000206953

**Draco Rosa | MANA Wynwood RC Cola Plant | Miami, FL | Sat, Nov 17, 2018**

Agent: Victor Mercado | vmercado@paradigmagency.com

### 6. TICKET SCALING AND PRICES:

| DESCRIPTION | QUANTITY | COMP | PRICE | TOTAL |
|---|---|---|---|---|
| Ticket 1 | 400 | - | 125.00 | 50,000.00 |
| Ticket 2 | 2,250 | - | 48.00 | 108,000.00 |
| Ticket 3 | 2,250 | - | 58.00 | 130,500.00 |
| Ticket 4 | 1,500 | - | 68.00 | 102,000.00 |
| CAP: 6,400   TOTALS: | 6,400 | 0 | | $ 390,500.00 GROSS POTENTIAL |

SCALING NOTES

### 7. DEDUCTIONS:

| DEDUCTIONS | EXC/INC | PRICE | TYPE | TOTAL |
|---|---|---|---|---|
| Facility Fee | Included | 2.00 | p.tckt. | 12,800.00 |
| | | | | $ 12,800.00 DEDUCTIONS |

### 8. TAXES:

| TAXES | AMOUNT | TYPE | TOTAL |
|---|---|---|---|
| Tax | 7 | % [/] | 24,709.35 |
| | | | $ 24,709.35 TAXES |

### 9. EXPENSES:

| EXPENSE | DESCRIPTION | TOTAL |
|---|---|---|
| Support | TBA | 2,500.00 |
| Production | - | 70,000.00 |
| Production Manager | - | 1,500.00 |
| Stagehands | - | 4,000.00 |
| Permits | - | 5,000.00 |
| Ground Transportation | - | 3,800.00 |
| Hotels | - | 9,000.00 |
| Catering | - | 3,000.00 |
| Motorhome | - | 6,800.00 |
| Rent | - | 20,000.00 |
| House Expenses / Nut | - | 12,500.00 |
| Security | - | 9,500.00 |
| Medical | - | 6,800.00 |
| Ticket Takers | - | 2,500.00 |
| Insurance | - | 2,000.00 |
| Portable Toilets | - | 4,725.00 |
| Advertising | - | 35,000.00 |
| Electric Plants | - | 3,000.00 |
| Transp Cultura | - | 2,800.00 |
| Miscellaneous | - | 5,000.00 |
| Insurance | - | 4,800.00 |
| Credit Card Charges | - | 4,100.25 |
| | | $ 218,325.25 EXPENSES |

### 10. MERCHANDISE:

100% All - Artist Sells

### 11. CONTACT DETAILS:

ARTIST:
**Draco Rosa**
Phantom Vox Entertainment, LLC
16027 Ventura Blvd. Suite 301
Encino, CA 91436

PROMOTER / PURCHASER:
**Emporio Group Entertainment**
2030 S Douglas Road, Event Age Restrictions: Suite 208
Coral Gables, FL 33134
Juan Jose Leandro
786) 615-3766
jjmusica@emporiogroup.com


PARADIGM TALENT AGENCY

**PERFORMANCE CONTRACT | # 188465 | PAGE 3 OF 3**

1658 NORTH MILWAUKEE AVENUE #211 | CHICAGO, IL 60647 | (773) 489-3500 | (773) 489-3535 FAX | NY LIC# 1010614-DCA / CA LIC# TA000206953

**Draco Rosa | MANA Wynwood RC Cola Plant | Miami, FL | Sat, Nov 17, 2018**

Agent: Victor Mercado    vmercado@paradigmagency.com

12. **ATTACHMENTS:**

PURCHASER shall fully comply with and abide by all of the terms and conditions set forth in ARTIST'S RIDER, attached hereto and incorporated herein by this reference, at PURCHASER's sole cost.

The ADDITIONAL TERMS attached hereto form a part of this Agreement and are incorporated herein by this reference.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**PURCHASER**

Emporio Group Entertainment
2030 S Douglas Road, Event Age Restrictions: Suite 208
Coral Gables, FL 33134
Federal Tax ID:

Signature:

Print Name:

Title/Position:

**ARTIST**

Phantom Vox Entertainment, LLC
16027 Ventura Blvd, Suite 301
Encino, CA 91436
Federal Tax ID: 81-3418156

Signature:

Print Name:

Title/Position:

**Exhibit "A"**   **PARADIGM ADDITIONAL TERMS & CONDITIONS**

As used herein, the term "Company" shall have the same meaning as the term "Artist Company" as defined in the facing pages of this Agreement.

1. **VENUE:**

    1.1 Under no circumstances may the Purchaser change the Venue for the Date of Engagement without Agent's or Company's prior written consent, which may be withheld in Agent's or Company's sole discretion, as applicable. Notwithstanding anything to the contrary contained herein, a change of Venue by the Purchaser in the absence of such consent shall constitute a material breach of this Agreement and Purchaser shall be liable for the full amount of Compensation due hereunder regardless of the date on which such change takes place.

    1.2 In addition to Venue, Purchaser hereby agrees to provide all necessary permits and licenses required by all applicable laws for purposes of lawfully conducting the Event. Unless otherwise agreed to by Agent in writing prior to the Date of Engagement, it is hereby acknowledged and agreed that Artist shall perform in the primary (main) featured performance area of Venue.

2. **DATE(S) OF ENGAGEMENT:**

    2.1 Artist's appearance on the Date of Engagement (hereinafter, the "Performance"), together with all other performances at the Venue on the Date of Engagement, is hereinafter collectively referred to as the "Event." Unless otherwise expressly agreed in writing by Agent, Purchaser may not make any announcements regarding the Performance contracted for hereunder until Company has received the initial deposit set forth in the paragraph titled "Payment Terms" of the Facing Page(s) of this Agreement and written authorization from Agent that such an announcement may be made. In the event that Purchaser breaches the terms contained in the foregoing sentence, Agent or Company may elect to immediately terminate this agreement upon giving written notice to Purchaser, without prejudice to any rights or claims Agent or Company may have. In the event of such termination, Company shall be entitled to retain any payments previously made by Purchaser hereunder and shall have no obligation to furnish Artist to perform on the Date of Engagement.

    2.2 Purchaser hereby acknowledges that, except as otherwise expressly set forth herein, each and every Deposit payment made hereunder is non-refundable. Contemporaneous with payment of the Deposit(s) hereunder and subject to the terms of paragraph 4.1 herein below, Purchaser is being granted the limited right to immediately exploit artist's approved name, image and logo (hereinafter, the "NIL Rights") solely for purposes of advertising, marketing and promoting the Event and the sale of tickets with respect thereto. Purchaser further acknowledges that the aforesaid grant of NIL Rights constitutes a value in consideration of the payment of any and all monies paid to Company hereunder prior to the Date of Engagement. For the avoidance of doubt, except as otherwise expressly set forth in writing between the parties hereto, the NIL Rights granted hereunder shall immediately revert to Company upon the earlier of (a) completion of the Performance, (b) material uncured breach of the Agreement by Purchaser, (c) cancellation of the Performance, or (d) termination of this Agreement by either party in accordance with the terms hereof.

3. **TICKET PRICE:**

    3.1 Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, Purchaser shall be solely responsible for payment of all taxes (including, without limitation, state and local sales taxes) associated with the sale of tickets for the Event.

    3.2 Purchaser shall not charge a surcharge, tax, or fee of any kind in addition to the ticket price stated herein.

    3.3 Purchaser shall not increase or decrease a ticket price, nor charge a fee based on an age differential, without prior agreement between Purchaser and Agent.

    3.4 The parties hereto hereby agree that a ticketing outlet of Company's choosing shall have the exclusive right to offer for sale one hundred percent (100%) of all tickets for the Events to be made available for purchase online.

Page 1 of 9                                                                                                                                                           Purchaser Initials _____
                                                                                                                                                                                    Company Initials _____

3.5 Subject always to the applicable data protection legislation, Purchaser shall make the Database available to Company free of charge. "Database" shall mean all statistical and demographic data gathered in connection with ticket sales for the Performance, including, without limitation, e-mail addresses of purchasers of tickets for the Performance.

4. **LINE-UP, BILLING, AND PROMOTION:**

   4.1 (a) Purchaser shall obtain the approval of Agent by e-mail over all advertisements and promotional material (including flyer design) using the Artist's name, likeness and/or logos prior to producing and/or disseminating any such materials.

   (b) In respect of the Date of Engagement hereunder, Artist shall receive one hundred percent (100%) headline billing with respect to all artist performances taking place at the Venue on all materials distributed by Purchaser to press and public. Artist shall be billed as set forth on the Artist Rider (as defined in paragraph 15.5 herein below) and in no other way without the prior written consent of Agent.

   (c) Purchaser must use Artist's NAME/IMAGE/LIKENESS/LOGO template (hereinafter, the "NIL Template") in all Event advertising (including, without limitation, poster, flyer, Internet, radio, TV, and print advertising). The NIL Template shall be provided by Agent promptly following execution of this Agreement.

   (d) Artist's artwork must be the predominant graphic element on all advertising.

   (e) Purchaser acknowledges and agrees that the Artist's name or likeness may not be connected in any way with any form of sponsorship or endorsement of any kind, including but not limited to commercial and political, without the prior written consent of Company. Without limiting the foregoing, there shall be no sponsorship branding on the stage on which the Performance takes place without Agent's prior written approval, which may be withheld in Agent's sole discretion.

   4.2 (a) Agent shall have the right to pre-approve the talent line-up for the Event.

   (b) Company reserves the right to choose the performing artist who will perform immediately prior to and/or immediately after Artist's set time.

   4.3 (a) Purchaser shall use best efforts to adequately promote the Performance by manufacturing and sending announcements, displaying posters, placing advertisements and by utilizing all other promotional methods that are standard practice in the industry. The costs of promotion shall be borne solely by Purchaser.

   (b) Any materials made available to Purchaser by Agent or Company, including, without limitation, materials embodying Artist's name, Artist's image and/or logo, and any other intellectual property owned or controlled by Artist (hereinafter "NIL Materials") shall be used solely in connection with promotion of the Performance on the Date of Engagement and shall remain the property of Company or Artist, as applicable. Company shall have approval over each use of the NIL Materials hereunder. In the event that Company determines, in Company's sole discretion, that any use of the NIL materials may adversely affect Company, Artist or Company's or Artist's intellectual property rights, as applicable, upon receipt of Company's written notice of the foregoing, Purchaser will use best efforts to immediately discontinue dissemination of the promotional materials identified in said notice and shall promptly destroy the unused materials or return them to the requesting party at Purchaser's sole cost and expense.

5. **PRODUCTION:**

   5.1 Not later than ten (10) weeks prior to the Date of Engagement, Purchaser shall submit to Company's designated representative, (hereinafter referred to as "Company's Representative"), for approval, a written production proposal (the "Production Proposal") which contains the proposed production budget ("Production Budget") for the Event and sets forth with reasonable specificity all proposed production elements therefore (including, without limitation, lights, video, special effects, sound, and staging). Promoter hereby warrants and represents that the level of production of the Event and all elements thereof shall be commensurate with Artist's stature in the musical artist market, and shall be appropriate for the size of the Venue, as determined by Company's Representative. Except as otherwise set forth herein or agreed in writing between the parties, in no event may Purchaser reduce line item expenditures below amounts set forth in the Production Budget as approved in writing by Agent or Company's Representative. Company shall have the right to insist upon the

Purchaser Initials _____

Company Initials _____

removal and/or addition of specific elements to the production (e.g., a laser), provided that such additional elements do not cause production costs for the Event to exceed one hundred ten percent (110%) of the approved Production Budget. For the avoidance of doubt, unless otherwise expressly agreed in writing between the parties hereto, Purchaser shall be responsible for any and all production costs including, without limitation, all costs that exceed the approved Production Budget in accordance with the foregoing sentence.

5.2 In the event of a breach of paragraph 5.1 herein above, without limiting any other rights and remedies Company may have under this Agreement, Company shall (i) have the right to refuse to furnish Artist to perform on the Date of Engagement and (ii) shall be entitled to retain any payments previously made by Purchaser hereunder.

6. **COMPENSATION:**

   6.1 (a) Company hereby directs and authorizes Purchaser to make all payments due hereunder as directed in the Payment Terms of the facing pages of this Agreement.

   (b) Such payment as aforesaid shall be made as an accommodation to Company and nothing herein contained shall constitute Agent as a beneficiary of or party to this Agreement. Such payment to Agent shall constitute payment to Company for all purposes of this Agreement and Purchaser will have no liability to Agent by reason of any erroneous payment Purchaser may make or failure to comply with such authorization. Company hereby indemnifies and holds Purchaser harmless against any claims asserted against Purchaser by reason of any such payment made pursuant to the terms of this paragraph 6.1(b).

   6.2 Company reserves the right to have Agent renegotiate the terms of compensation set forth in the paragraphs titled "Compensation" and "Payment Terms," respectively, of the Facing Page(s) of this Agreement in the event that attendance at the Event exceeds the "Capacity" amount set forth in the paragraph titled "Ticket Scaling and Prices" of the Facing Page(s) of this Agreement.

   6.3 In the event that payment to Company is based in whole or in part on receipts of the Performance(s) hereunder, Purchaser agrees to deliver to Company a certified statement of the gross receipts of each performance within two (2) hours following the applicable Performance. Company shall have to right to have a representative present in the box office at all times and such representative shall have access to box office records of Purchaser relating to gross receipts of the Event only.

   6.4 In the event that contingent compensation is payable under this Agreement, Company or Agent shall have the right to appoint an accountant or auditor to examine the Purchaser's books and records as they pertain to this Agreement, provided such examination shall take place at Purchaser's offices during business hours with reasonable notice at Company's sole expense. Notwithstanding the foregoing, if an underpayment of the amounts set forth herein is found as a result of such an examination, then Purchaser shall immediately reimburse Company for the costs of such examination together with the shortfall amounts discovered through such examination.

7. **TAXES AND VISAS:**

   7.1 Purchaser shall pay for any and all taxes (excluding any income or Non-resident Withholding Tax that may be owed by Company), which may become due in connection with the Performance. For the avoidance of doubt Purchaser shall be responsible for any airport arrival and departure taxes incurred in respect of Artist and Artist's guest's travel. Purchaser shall not offset any expenses or taxes of any type against the Guarantee hereunder.

   7.2 Notwithstanding anything to the contrary contained herein, Company's federal non-resident withholding tax amount hereunder may not exceed the required amount established by the applicable tax authority. Purchaser must make withholding payments to the U.S. Internal Revenue Service and any other applicable state and/or local tax authority (individually and collectively, the "Tax Authority") in accordance with the terms of applicable law, but in no event later than thirty (30) days from the Date of Engagement. Purchaser shall promptly provide Agent with wire confirmation evidencing that Purchaser has withheld and paid over to the Tax Authority in a timely manner the requisite amount. In the event that Purchaser is in breach of the terms of this paragraph 7.2

and fails to remedy such breach within five (5) business days of receipt of Company's written notification of such breach, Company shall have the right to immediately terminate this Agreement by written notice to Purchaser (the "Termination Notice") and any and all rights granted to Purchaser hereunder (including, without limitation, rights of exclusivity) shall be immediately revoked. In the event of any such termination, within five (5) business days of Purchaser's receipt of the Termination Notice, Purchaser shall pay to Agent the balance of the Guarantee and Agent shall become the withholding agent with respect to the Date of Engagement. Without limiting the foregoing, Purchaser shall be liable for any and all penalties assessed by the Tax Authority against Company and/or Artist for Purchaser's failure to make timely payment to the Tax Authority of amounts required to be withheld hereunder.

7.3 Under no circumstances may Purchaser make cash payments under this Agreement. Purchaser hereby acknowledges that (i) Agent will not accept cash deposits as payment hereunder and (ii) any cash payments made in violation of the foregoing provision will be forfeited to Agent and not be deemed to be compensation to Company or applied to offset any payments due to Company hereunder.

7.4 Purchaser, where applicable, shall be responsible for obtaining and paying for any work permits and visas (U.S. work permits excluded) required for Artist and any member of Artist's crew to work legally in country of performance on the Date of Engagement which shall be valid for the duration of Artist's stay in country of performance. Purchaser shall be responsible for paying for any additional costs incurred in obtaining a visa, including but not limited to courier fees, travel and accommodation expenses, and taxi fare.

## 8. MERCHANDISE:

8.1 Purchaser hereby gives permission to Company to sell merchandise and other Artist-related products before, during and after the Performance. Purchaser shall not receive any commission or other remuneration with respect to such sale of merchandise or other Artist-related products hereunder.

8.2 Notwithstanding anything to the contrary contained herein, Purchaser shall ensure that, in the absence of Company's prior written to the contrary, no merchandise other than consumables and merchandise sold by Company's representatives under 8.1 herein above shall be sold at the Venue for the duration of the Event.

## 9. EQUIPMENT AND HOSPITALITY:

9.1 (a) Purchaser agrees to setup an appropriate performance area that is free from interruption.

(b) Purchaser hereby agrees to provide, at Purchaser's sole cost and expense, a first-class sound and lighting system, to include the equipment and technical specifications set forth on the Artist Rider.

(c) Purchaser shall check all equipment for defects and to ensure proper functioning on the Date of Engagement prior to the Performance. Purchaser will indemnify Company, Agent and Artist from any liability resulting from damage to equipment arising at any time before, during or after the Performance hereunder, except in respect of damage caused by any intentional act or omission by Artist or Artist's gross misconduct.

(d) At any time and without prior notice, Company shall have the right to cancel or shorten the Performance hereunder if, in Company's reasonable business judgment, Purchaser has failed to adhere to the requirements set forth herein in respect of the equipment or if the equipment fails to function properly on inspection or during the Performance.

9.2 Purchaser shall provide Artist with a clean and comfortable dressing room area conforming to the specifications set forth on the Artist Rider.

9.3 Company shall have the right to invite the number of guests referred to as "Artist Comps" in the paragraph titled "Ticket Scaling and Prices" of the Facing Page(s) ("Artist's Guests") to attend on the Date of Engagement, and each of Artist's Guests shall be given access to the Venue free of charge. Company's list of Artist's Guests will be honored throughout the entire Date of Engagement from doors to closing. The Agent's guest list shall not be deducted from Company's guest allotment set forth in this paragraph 9.3.

## 10. RECORDING:

Purchaser Initials _____

Company Initials _____

### 10.1 Company's Recording:

Purchaser hereby acknowledges and agrees that Company and/or anyone engaged, authorized, employed or supervised by Company, may photograph, video tape, and/or otherwise record, reproduce and distribute such recordings of the Event including the Performance hereunder ("Recordings"), in whole or in part, in any manner or media, and any such Recordings from the inception of recording thereof, and all copies manufactured therefrom, together with the images and/or performances embodied thereon, shall be the sole property of Company or Company's designee, as applicable ("Copyright Holder"), throughout the world, free from any claims whatsoever by Purchaser or any third party (including, without limitation, Purchaser's affiliates, partners, investors and the Venue owner) ("Third Party"), and Copyright Holder shall have the exclusive right to copyright such Recordings in its name as the sole and exclusive owner and author thereof and to secure any and all renewals and extensions of such copyright. Neither Company, Artist nor Company's or Artist's designee shall have any obligation to obtain permission from or provide credit to Purchaser, except as otherwise required by law. For the avoidance of doubt, Company shall be solely responsible for the following in connection therewith: (a) any and all costs and expenses, including without limitation, additional labor costs that Company may incur in connection with the Recordings (all of such costs and expenses being specifically excluded from show costs and expenses); (b) any and all liabilities; and (c) any and all appropriate third party clearances, authorizations and approvals.

### 10.2 Other Recordings:

(a) Purchaser warrants that Purchaser shall not, nor shall Purchaser, authorize others to photograph, video tape, record or otherwise reproduce Artist's likeness or image in any manner, nor shall Purchaser record (in any medium) or broadcast (via any means, including, without limitation, radio or internet), or authorize others to record or broadcast, any portion of the Performance without Company's prior written consent, which may be withheld in Company's sole discretion, as applicable. If it becomes evident to Artist or Company that any of the foregoing prohibited activities is occurring during the Event, Artist may discontinue Artist's Performance immediately and neither Agent, Artist nor Company shall be obligated to return any monies previously paid by Purchaser under the Agreement.

(b) Purchaser warrants and represents that Purchaser will use Purchaser's best efforts to prevent the recording, by any means or media, and dissemination of the Performance hereunder except as otherwise expressly permitted herein.

(c) Purchaser will be liable to Company and Artist for any loss, damage or expense (including reasonable attorneys' fees) incurred or suffered by Artist as a result of a breach of subparagraphs 10.2(a) or 10.2(b) herein above. For the avoidance of doubt, except as otherwise expressly permitted in writing by Company, Purchaser shall be strictly liable for any damages suffered by Company or Artist as a result of (1) the creation of an unauthorized recording of Artist's performance hereunder by means of the sound board, artist equipment, monitors or any other part of the Venue's audio-only and audio/visual installation, and (2) the dissemination of any such recording.

## 11. CANCELLATION:

### 11.1 Company Cancellation of Performance:

(a) Without prejudice to any rights, claims or remedies Company may have under this Agreement at law or in equity, in the event that Purchaser breaches any term of this Agreement and such breach is not cured in accordance with the terms of paragraph 14.1 herein below, Company shall have the right to immediately cancel this Agreement. Such breaches include, but are not limited to, the following:

(i) Purchaser does not make timely payment to Agent any amount due as set forth on the Facing Page(s), of this Agreement herein above or otherwise materially breaches the terms of this Agreement, including, without limitation, as contained in the paragraphs titled "Compensation" and "Payment Terms," respectively, of the Facing Page(s), or fails to perform any material obligation required of Purchaser hereunder;

(ii) On or before the Date of Engagement, Purchaser has failed, neglected or refused to perform any contract with any other performer for any earlier engagement and, following receipt of Company's written demand therefor, Purchaser fails to promptly make full payment of the Guarantee due hereunder; or

(iii) Agent, in its sole discretion, determines that Purchaser is unable to pay its debts as they become due in the ordinary course of business; or

Purchaser Initials _QP_

Company Initials _____

(iv) A voluntary or involuntary bankruptcy petition is filed by or against Purchaser, Purchaser goes into compulsory liquidation, makes an assignment for the benefit of creditors, is in receivership or makes any composition with creditors.

(b) In the event of any cancellation by Company under 11.1(a) herein above,

(i) Neither Agent, Company, nor Artist shall be obligated to refund any payments made by Purchaser hereunder prior to the date on which cancellation takes place, nor shall Agent, Company nor Artist have an obligation to mitigate with respect to amounts owed by Purchaser hereunder;

(ii) Purchaser shall remain liable to Company for the full amount of the Guarantee;

(iii) Company shall have no obligation to furnish Artist to perform for Purchaser hereunder and Company may contract with one or more third parties for Artist to perform for such third party(ies) on the Date of Engagement; and

(iv) Neither Company, Agent nor Artist shall be liable to Purchaser for any costs or losses of any kind whatsoever suffered by Purchaser as a result of such cancellation.

## 11.2 Purchaser Cancellation of Performance:

If, for any reason (including, without limitation, a cancellation under paragraph 11.3 herein below), Purchaser cancels the Performance following the date of execution hereof, Purchaser shall remain liable to Company for the full amount of the Guarantee due hereunder.

## 11.3 Cancellation of the Performance due to Force Majeure Event:

(a) Notwithstanding anything to the contrary contained herein, the Performance may be cancelled by either party due to cause(s) beyond the reasonable control of the parties hereto that would render the Performance hereunder impossible or make conditions for the Performance hazardous. Such causes shall include, but not be limited to: acts of God; weather; acts of war; riot; fire; explosion; accident; flood; sabotage or terrorist act; transportation failure or delay; governmental or court ordered laws, regulations, requirements, orders or actions; injunctions or restraining orders; strike(s) or injunction (provided that neither party shall be required to settle a labor dispute against its own best judgment), technical failures beyond the reasonable control of the parties hereto, or other causes of a similar or different nature beyond the reasonable control of the parties hereto (hereinafter "Force Majeure Event"). Neither Company, Agent nor Artist shall be held liable for any losses, costs or damages whatsoever suffered by Purchaser due to Artist's failure to perform as a result of a Force Majeure Event.

(b) (i) In the event that the Performance is cancelled due to a Force Majeure Event and Artist is ready and willing to perform, Company shall be entitled to retain or receive, as applicable, within ten (10) days of the cancelled Date of Engagement, one hundred percent (100%) of the Guarantee.

(ii) In the event the Performance is cancelled pursuant to a Force Majeure Event that renders Artist unready and/or unable to perform, Company shall be entitled to retain or receive, as applicable, within ten (10) days of the cancelled Date of Engagement, fifty percent (50%) of the Guarantee.

## 11.4 Cancellation of the Performance due to Incapacitating Illness or Accident to Artist:

In the event of an incapacitating illness or accident to Artist or essential crew member or the death or terminal illness of a member of Artist's family that prevents Artist from being ready, willing and able to perform a Date of Engagement hereunder, it is understood and agreed that (i) Artist shall not be required to perform the scheduled engagement(s), (ii) neither Company, Agent nor Artist shall be liable for any costs or losses of any kind whatsoever suffered by Purchaser and (iii) Purchaser agrees to release Company, Agent and Artist from any liability with respect thereto. Unless otherwise expressly agreed in writing between the parties, in the event of cancellation by Company under this paragraph 11.4, Company shall return to Purchaser within ten (10) business days following the Date of Engagement, all sums received by Company under this Agreement less Artist's bona fide reasonable out-of-pocket expenses incurred in connection herewith.

11.5 Company warrants and represents that Company has accepted this engagement in good faith and will use Company's reasonable good faith endeavors to cause Artist to fulfill Artist's obligations hereunder.

Purchaser Initials _____
Company Initials _____

## 12. SECURITY AND INSURANCE:

12.1 (a) Purchaser shall be solely responsible to provide a safe environment for the Event including regarding the staging, stage covering, electrical grounding, supervision and direction of the Performance, and adequate security, so that the Performance and all persons and equipment are free from adverse weather and other unsafe conditions, situation and events ("Dangerous Conditions"). Dangerous Conditions may include but not be limited to recent acts of violence, riots or political unrest; faulty or insufficient electrical power; inadequate or unsafe staging; inadequate crash barrier; rain penetration or any other hazardous condition which, in the reasonable opinion of the Artist or Artist, may result in damage or injury to Artist or Artist's equipment, or to anyone engaged or furnished by Artist, or to any other persons or equipment for whom or which Artist may be held responsible. Artist and Artist shall not have any liability for any damage or injury caused by such Dangerous Conditions except to the extent such is solely and directly caused by Artist's or Artist's negligence or willful misconduct.

(b) Notwithstanding anything to the contrary contained herein, Artist reserves the right to decline to furnish Artist perform if, in its sole discretion, Artist deems conditions at the Venue to be Dangerous Conditions. In the event that the Performance is cancelled due to Dangerous Conditions (as defined in paragraph 12.1(a) herein above), Purchaser shall be obligated to pay Artist one hundred percent (100%) of the Compensation due in connection with the Performance cancelled.

(c) Purchaser will provide and pay for an adequate number of sober, able-bodied and clearly identifiable professional security persons for the scale of the Event and in accordance with the terms of the Artist Rider Security must ensure safety of Artist and Artist's equipment, personal property, Artist's crew and vehicles for the duration of the Artist's stay at the Venue (including, without limitation, the parking facilities and surrounding grounds).

12.2 (a) Purchaser agrees to provide public and general liability insurance coverage (including automobile, liability and comprehensive) to protect against any claim for personal injury or property damage or otherwise brought by or on behalf of any third party, person, firm or corporation as a result of or in connection with the Date of Engagement, including as a consequence of the installation and/or operation of the equipment provided by Artist. In addition, it is agreed that Purchaser shall maintain in effect a policy of workmen's compensation insurance covering all of its employees and other personnel who are involved in the installation, operation and or maintenance of the equipment provided by Producer. The Purchaser further agrees to provide full insurance coverage for all equipment provided by Artist or Artist's agents, contractors and employees against fire, theft, riot or any other type of act that would cause harm or damage to equipment. Without limiting the foregoing, Purchaser shall also secure and maintain a commercially standard event cancellation insurance policy for the Event which does not exclude cancellation for a Force Majeure Event or an Inclement weather cancellation, except for the following exclusions: acts of war; failure of means of transportation; terrorist act; governmental or court ordered laws, permitting, zoning, licensing or other city/municipal/state/parish issues, or other commercially reasonable exclusions. Purchaser shall supply Agent with certificates of insurance showing coverage of the above at least ten (10) days prior to the show date. However, if said certificate is not received by Agent prior to the above date, then Company at Company's election may terminate this Agreement. If Company elects to furnish Artist to perform the Engagement and the certificates of insurance have not been received, Purchaser is still solely responsible for complete coverage as specified above.

(b) Purchaser shall obtain and maintain, from the date hereof through completion of the Engagement, commercial general liability insurance coverage as required under sub paragraph 12.2(a) hereinabove and shall name Company, Artist, and Agent as additional named insureds in an amount of not less than Three Million Dollars ($3,000,000) per occurrence (but in no event in amounts less than the limits require by the venue) and workers compensation and employer's liability insurance (including stop gap liability where applicable) with minimum limits of One Million Dollars ($1,000,000) per claim (but in no event in limits less than those required by law and/or less than the limits required by the venue and/or as set forth in the Artist rider, if any).

(c) Purchaser hereby agrees to indemnify and hold Company, Artist, Agent and their contractors, employees, licensees, designees and agents (individually and collectively, the "Artist Indemnitees") harmless from and against any loss, damage or expense including reasonable attorneys' fees incurred or suffered by or threatened against the Artist Indemnitees in connection with or as a result of any claim for personal injury or property damage or otherwise brought by or on behalf of any third party, person, firm, entity or corporation as a result of or in connection with the Engagement, which claim does not result

Purchaser Initials _____

Company Initials _____